IRA C. VAN NOY, Respondent, v. CENTRAL UNION FIRE INSURANCE COMPANY (a corporation), Appellant.

**Kansas City Court of Appeals, February 17, 1913.**

1. CORPORATIONS: Principal and Agent: Contracts. A corporation is not responsible for contracts entered into, before it came into existence, by promoters assuming to bind the company in advance; no principal of the law of agency being applicable to a case of this kind, as agency implies the existence of a principal.

2. ———: Contracts: Promoters. When a corporation becomes a legal entity, the corporation has the option of adopting or repudiating contracts for its benefit made by its promoters, and the exercise of such option may be manifested, as well, by acceptance and retention of the benefits of such contracts, as by an express agreement.

3. ———: ———: ———. Under Sec. 7001, R. S. 1909, a corporation becomes a corporate entity for the purpose of entering into contracts when it receives its certificate of incorporation; and in accepting the benefits of the contracts of its promoters, it adopted those contracts as its own, and takes them with all their burdens and infirmities.

4. ———: ———: Readjustment Contract: Scope of Authority. When an officer of a corporation is given authority to enter into a new contract in the nature of a readjustment and compromise of the old, the acts of that officer performed within the apparent scope of such authority binds the corporation, though they exceeded the limits of the authority intended to be conferred.

Appeal from Jackson Circuit Court.—*Hon. Jas. H. Slover*, Judge.

AFFIRMED.

*Leslie J. Lyons* for appellant.

*Franklin D. Glore* for respondent .

JOHNSON, J.—Plaintiff alleges he bought and paid for 150 shares of the capital stock of defendant corporation and that defendant delivered to him a certificate for 100 shares but refused to issue a certificate for the remaining fifty shares and converted them to its own use. The prayer of the petition is for the recovery of the value of the shares so converted. The answer is a general denial.

A trial of the cause resulted in a verdict and judgment for plaintiff in accordance with the prayer of the petition. Defendant appealed and argues, first, that the jury should have been peremptorily instructed to return a verdict in its favor.

The defendant is a fire insurance company, organized and incorporated in this State under the provisions of article 6, chapter 61, Revised Statutes, 1909. On April 2, 1910, the organization of the company reached the point where the incorporators became entitled to a preliminary certificate of incorporation and such certificate was issued to them on that date by the Secretary of State under the provisions of section 7001, Revised Statutes, 1909, which declare that on the receipt of such preliminary certificate the corporators "shall be a body politic and corporate, and may proceed to organize in the manner set forth in their charter and to open books for subscription to the capital stock of the company and keep the same open until the whole amount specified in the charter is subscribed, but it shall not be lawful for such companies

to issue policies or transact any business of any kind whatever, except as aforesaid, until they have fully complied with the requirements of sections 7002 and 7003.''

These requirements were not fulfilled until October 17, 1911, on which date a final certificate was issued authorizing the corporators to transact business with the public as a fire insurance company. Prior to that time the activities of the incorporators had been confined to the organization of the company and their chief task had been to sell the treasury stock. The plans of the promoters contemplated that the capital stock should be 100,000 shares of the par value of ten dollars per share and that sales agents should be employed to sell the stock. To pay the commissions of these agents and to defray the expenses of the preliminary organization it was proposed to sell the stock at a premium in order that the corporation might begin business with an unimpaired capital. 20,000 shares were set apart for sale "to the directors and founders of the company" at $12.50 per share leaving a margin of $2.50 per share for the expenses and commission fund. It was proposed to distribute this stock among fifty different men of high reputation in the business world to be known as the "founders" of the company, and after such distribution had been effected, to place the remaining 80,000 shares on the market for sale to the general public at twenty dollars per share. Accordingly a general sales agent was employed by the promoters to sell the stock on commission and in his contract of employment it was agreed that he would "set aside out of his commission twenty-five cents a share on each of the 80,000 shares of stock sold at twenty dollars a share and deposit same with the treasurer as a fund to be divided equally between the fifty founders when the sale of the capital stock of the company is completed. The division of the said

fund to be considered as compensation to the fifty founders for the labor and expense of answering letters of inquiry and furnishing such letters of introduction as may be required."

This contract, therefore, provided for the creation of a fund which would amount to $20,000 when all of the 80,000 shares were sold by the agents and it was intended by the promoters and promised by the agents to persons solicited to become founders that this fund should be divided equally among the fifty founders so that each would receive $400 as a rebate on the purchase price of his stock. Consequently, a founder who subscribed for 400 shares paid $5000 for his stock and received it with the agreement of defendant to refund him $400 when all of the stock offered to the public had been sold. In other words the inducement held out to a founder was that he would be permitted to obtain a block of stock for $4600, which would cost a general subscriber $8000.

Further it appears that, doubtless, for the purpose of aiding the agents in procuring desirable founders the 20,000 shares were divided into blocks of fifty shares each and the agents were authorized in some instances to give a rebate agreement with the sale of one of such blocks but were not authorized to offer any one founder more than a single rebate.

Plaintiff was solicited by agents thus employed to become a founder and on March 15, 1910, he subscribed for a block of fifty shares at $12.50 per share, or $625 for the block. He paid $125 (the amount of the premium) in cash and gave three notes in payment of the remainder of the price, due in two, four and six months. The sale was made on the condition that he was to have a founder's rebate which, if he had made no further purchase of stock, would have reduced the cost of his stock to $225. On March 19, at the solicitation of the agents, he purchased another block at the same price and he says on the same terms

and in the afternoon of the same day he bought 300
shares more. In payment of the last purchase he gave
four promissory notes maturing at different dates
during the summer, one for $750, which represented
the premium on the 300 shares and three for $1000
each, representing the par value. Plaintiff states that
he bought this stock on the representation and agree-
ment that he would be entitled to a single rebate for
each block or, six rebates in all, which on payment of
the rebates would reduce the cost of the 300 shares
from $12.50 each to five dollars. Three weeks later
and after the corporators had received the prelim-
inary certificate of incorporation, plaintiff was in-
formed by another sales agent that the promise that
he should have a rebate for each block, which was
orally made, was unauthorized and that the agents
had misrepresented the terms of the sale. He imme-
diately interviewel the attorney of the corporators
and was informed that he would be entitled only to
one rebate for all his purchases. He then went to
the office of the corporators and declared to the secre-
tary who was in charge his purpose to rescind the sale
of the 300 shares on the ground of the false and fraud-
ulent representations of the agents. The secretary
assured him, so he states, that they would not allow
their agents to perpetrate such frauds, that the mat-
ter would be fixed and suggested that plaintiff should
come before the directors at their next meeting and
lay the case before them. Plaintiff assented to this
proposal and came to the next meeting. He was met
by the secretary who stated, in effect, that it would
not be necessary for him to go into the meeting of the
board and that the matter would be adjusted by him
and the general sales agent who was present. The
secretary then explained that the note given by plain-
tiff for $750 had been discounted at a bank to procure
funds for expenses and commissions and could not be
returned but that they would return the three notes

of $1000 each and when the time came to issue stock certificates, would issue a certificate to plaintiff for 150 shares to cover the first two purchases aggregating 100 shares and fifty shares in lieu of a return of the $750 note. Plaintiff agreed to this proposal and thus the sale of the 300 shares was rescinded by agreement and in lieu of that sale plaintiff purchased a third block of stock for the payment of which defendant had his note of $750. He paid this note and the other notes given in the first two transactions and became entitled to a certificate for 150 shares; but defendant afterward denied the agreement and issued a certificate for only 100 shares, refusing to acknowledge plaintiff's ownership of the remaining fifty shares.

The evidence of defendant differs in vital respects from that of plaintiff from which the foregoing statement is taken. According to the testimony of defendant's witnesses it appears that defendant's officers did not admit nor act on the statement of plaintiff that false representations had been made to him by the sales agents and that he had been promised a rebate on each block of fifty shares, nor did they agree to rescind the sale of the 300 shares. The subscription agreement was in writing contained the provision that if plaintiff should "make default for thirty days after same becomes due in any of said deferred payments, this contract shall be returned to me and the company shall retain all payments theretofore made as liquidated damages and the company may resell said stock." The secretary testified that plaintiff urged other reasons for being released from the contract than his claim of fraud and that he told plaintiff that defendant would endeavor to resell the stock and if successful would return plaintiff's three notes of $1000 each, but would not return the $750 note or its proceeds since it had been used for organization expenses. He promised, though, to give plain-

tiff fifty shares of stock for that note, provided that the resale of the 300 shares could be made without expense to defendant. Afterward the stock was resold by defendant but with the usual expense and outlay of commissions incidental to such sales. The minutes of the difectors' meetings show that on June 10, 1910, plaintiff appeared in person before the board "in explanation of his purchases and requested a cancellation of his subscription" and that a committee was appointed "to investigate said purchase and report on same to the first executive committee meeting to be held one week from that date."

On July 29, at a meeting of the directors the following resolution was adopted: "Whereas, I. C. Van Noy heretofore subscribed for three hundred shares of the capital stock of this company, first series, as shown by subscription contract No. 1651, and whereas subsequently and in lieu thereof E. L. Harrison, subscribed for one hundred shares of the capital stock of the company, first series, as shown by subscription contract No. ——, and S. R. Hill subscribed for one hundred shares, first series, as shown by subscription contract No. 2480, and the Brown News Company subscribed for one hundred shares, first series, as shown by subscription contract No. 1846, all of which three latter subscriptions were made in lieu and in place of the stock subscribed by the said I. C. Van Noy.

"Therefore, be it resolved by the board of directors that the said I. C. Van Noy subscribed for and the same is hereby canceled, and the said subscription by E. L. Harrison, S. R. Hill and the Brown News Company are accepted in place thereof, and the treasurer of the company is directed to surrender to I. C. Van Noy his three unpaid notes for $1000 each in exchange for his original receipt, and upon the further condition that the first payment made by the said I. C. Van Noy upon said original subscription for said

three hundred shares, being in the amount of $750, is hereby forfeited by him to this company."

Plaintiff paid his note of $750 to the bank May 18, 1910. On June 23, 1910, he executed and delivered to defendant a written assignment of the 300 shares of stock conditioned for the cancellation and return of his three notes of $1000 each. The notes were returned to him some time in the following August and the certificate for 100 shares of stock was issued and delivered to him January 11, 1911. The evidence does not show that the board of directors gave the secretary of the company express authority to release plaintiff from his subscription to the 300 shares and to enter into a new contract to give plaintiff fifty shares for the note of $750. The prinicpal issue of fact in the case is whether the secretary assuming to have authority so to do, agreed to a rescission of the contract for the 300 shares and to issue to plaintiff a certificate for fifty shares in lieu of the note for $750. The evidence as a whole shows quite clearly that a serious controversy had arisen between the parties over the sale, that plaintiff was insisting he had been defrauded and that the secretary, while not admitting the charge, regarded and treated the case as one that should be adjusted and settled.

Indeed, both parties appear to have entertained the thought that a compromise should be made. According to the statement of plaintiff he was willing to pay a higher price for fifty shares of stock that he had paid for the other stock he had purchased, while the secretary admits he agreed to release plaintiff from the sale in the event defendant could resell the stock and to release him without loss if the resale could be made without additional expense. The contention of each party as to the terms of this compromise agreement is supported by substantial evidence and both are reasonable and plausible. The jury decided to accept plaintiff's version of the transaction and in the

consideration of the demurrer to the evidence we shall assume as proved the statement of plaintiff that the secertary agreed to a rescission and to give him fifty shares of stock for his note of $750. Counsel for defendant has closely analyzed the evidence and has pointed out the weak points of that relied on by his adversary, but after all is said in favor of that analysis that may be said, it merely goes to the issue of the weight of the evidence and falls short of demonstrating that plaintiff's position is not supported by substantial evidence. We must draw every reasonable inference that may be drawn in favor of plaintiff and so doing must hold that his evidence presents the issue we have been discussing as one about which reasonable minds well might differ and, therefore, as an issue of fact for the jury to determine.

But it is argued the evidence fails to show that defendant's secretary had authority to enter into a new contract on behalf of the corporation.

The three contracts for the purchase of stock entered into between plaintiff and the sales agents of the promoters of the corporation were made before the corporation received the first certificate which, as stated, was issued by the Secretary of State April 2, 1910, and being made before a corporate entity came into being, were contracts with the promoters which the corporation was not bound to accept as made in its behalf.

The rule is well settled that a corporation is not responsible for contracts entered into before it came into existence by promoters assuming to bind the company in advance. No principle of the law of agency is applicable to a case of this kind, as agency implies the existence of a principal. [Blackwell v. Adams, 28 Mo. App. l. c. 61; Davis v. Creamery Assn., 63 Mo. App. 477.] After becoming a legal entity the corporation has the option of adopting or repudiating contracts for its benefit made by its promoters and the

exercise of such option may be manifested as well by the acceptance and retention of the benefits of such contract as by an express formal ratification. Indeed it is pointed out by the Supreme Court in Furniture v. Crawford, 127 Mo. l. c. 364, that there can be no ratification by a corporation of a contract formed by its promoters prior to the completion of the corporate organization. "The so-called ratification by the corporation is nothing more nor less than the making of an original contract. The fact that the corporation makes the same contract theretofore made by its promoters does not constitute a ratification but is an original contract of the corporation . . . This so-called adoption need not be shown by express acts, but may be proven by acquiescence, as any other original contract might be shown." [See, also, Contracting Co. v. Construction Co., 150 Mo. App. 505.]

Defendant became a corporate entity for the purpose of entering into contracts for the sale of its capital stock on April 2, 1910, when it received its first certificate (section 7001, R. S. 1909), and in accepting the benefits of the contracts its promoters had procured from plaintiff, it adopted those contracts as its own and took them with all their burdens and infirmities. If, as plaintiff contends, the last of those contracts, each of which was a distinct and independent transactions, was procured from him by false and fraudulent representations on which he relied under circumstances justifying such reliance, defendant took the benefits of that contract to plaintiff's right of rescission on the ground of fraud. Plaintiff elected to exercise that right and appearing at the principal office of defendant, expressed his purpose to the officer of defendant in apparent charge of the office and demanded the return of his notes. That this officer communicated to the board of directors the substance of plaintiff's complaint and demand is a fact about which there can be no real dispute and that the

board invested the officer with authority to act for
the corporation in adjusting the controversy is an in-
ference that finds abundant support in the evidence
of defendant as well as in that of plaintiff. The sub-
stance of the testimony of the secretary is that he
agreed that the corporation would endeavor to sell
the stock and if successful would return plaintiff's
notes which represented its par value and if such sale
could be effected without expense, would give plain-
tiff fifty shares of stock for his note representing the
premium. The minutes of the meetings of the board
from which we have quoted tend to show that the sec-
retary had been given authority to enter into that kind
of a compromise agreement with plaintiff, and on this
premise we do not hesitate in saying that given au-
thority to enter into a new contract in the nature of a
readjustment and compromise of the old, the acts of
the secretary performed within the apparent scope of
such authority would bind the defendant though they
exceeded the limits of the authority intended to be
conferred.

In other words, if defendant told its agent to com-
promise the case with a conditional agreement to give
plaintiff fifty shares of stock for his premium note and
the agent exceeded the instructions by entering into
an unconditional agreement, we say he was acting
within the apparent scope of his real authority which
was the authority to represent the corporation in com-
promising a business controversy and defendant is
bound by his act.

And, further, we hold that the evidence, as a
whole, will support an inference that the secretary
not only had apparent authority to compromise the
case on the terms of the settlement plaintiff states was
made, but had real authority to make the settlement
and that defendant purposely delayed the execution of
the compromise agreement until after the maturity of
the notes plaintiff gave for the purchase price of the

stock when the claim could be advanced with show of reason that the resale of the stock had been made under the terms of the forfeiture clause in the subscription contract and not pursuant to any compromise agreement; and in this way the proceeds of the $750 note could be retained by defendant as liquidated damages for the alleged breach by plaintiff of the subscription contract. The evidence of plaintiff and the reasonable inferences that may be drawn from it support the contention of plaintiff that defendant, through its authorized agents, entered into a compromise agreement to issue him a certificate for 150 shares of stock and that in refusing to issue a certificate for more than 100 shares, defendant, in fact and in law, converted fifty shares of stock belonging to plaintiff to its own use.

The demurrer to the evidence was properly overruled.

Objection is made to the instruction on the measure of damages but we rule that the instruction declares the only proper rule for application in a case of this character. Another objection to the instructions has been fully answered in what we have said on the demurrer to the evidence. The cause was fairly tried and the judgment is affirmed.

All concur.